# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**FLORIDA MARINE CONTRACTORS,**
*et al.*

      **Plaintiffs,**

**v.**                                                          **Case No.  2:03-cv-229-T-30SPC**

**STEVEN A. WILLIAMS, DIRECTOR,
UNITED STATES FISH AND WILDLIFE
SERVICE,** *et al.*

      **Defendants.**

_____

## <u>ORDER</u>

THIS CAUSE comes before this Court upon (I) a Motion for Judgment on the Pleadings (Dkt. #57) filed by Defendants Steven A. Williams, in his official capacity as Director of the U.S. Fish and Wildlife Service, the U.S Fish and Wildlife Service, and Gale Norton, in her official capacity as Secretary of the U.S. Department of the Interior ("Defendants"); (ii) a response thereto (Dkt. #66) filed by Plaintiffs Florida Marine Contractors Association, et al. ("Plaintiffs"); (iii) a Second Motion for Summary Judgment (Dkt. #67) and memorandum of law in support (Dkt. #68) filed by Plaintiffs; and (iv) responses thereto (Dkt. ## 80, 81, 82) filed by Defendants and the Save the Manatee Club as *Amici Curiae*.

For the reasons stated herein, this Court finds that Defendants' Motion should be GRANTED and Plaintiffs' Motion should be DENIED.

## I.   BACKGROUND

This case involves the scope of the Marine Mammal Protection Act, 16 U.S.C. § 1361 *et seq.* (the "Act"), and specifically whether the environmental protections contained therein apply to recreational docks built on Florida's inland waterways.   Plaintiffs are land owners, marine contractors, and a marine contractors' industry association seeking permits (on their own behalf or on the behalf of others) to construct docks and other similar structures (hereafter "docks") on Florida's inland waterways that are inhabited by Florida manatees. These docks will be used by property owners for recreational purposes, including the operation of recreational motorboats from the docks to other nearby bodies of water and the docking of these motorboats when they are not in use.

Plaintiffs applied for building permits for the docks with the appropriate state authorities, who forwarded the applications to the U.S. Army Corps of Engineers ("Corps") for federal permitting pursuant to Section 404 of the Clean Water Act, 33 U.S.C. § 1344. Because the Corps determined that the issuance of the permits might threaten the West Indian manatee, commonly known as the Florida manatee, it consulted with the Fish and Wildlife Service (the "Service") in accordance with Section 7 of the Endangered Species Act, 16 U.S.C. § 1536, and the regulations promulgated thereunder.[1]   The Service, in turn, had to

---

[1]  This Section of the Endangered Species Act and the regulations promulgated thereunder prohibit federal agencies from taking actions which are "likely to jeopardize the continued existence

determine whether the issuance of the permits was prohibited by Section 1371(a)(5)(A) of the Act since "an endangered species or threatened species of a marine mammal [wa]s involved." <u>See</u> 16 U.S.C. §1536(b)(4)(C); 16 U.S.C. § 1362(6) (defining "marine mammal" as including members of the order Sirenia); 50 C.F.R. § 23.23 (identifying the West Indian manatee as a member of the order Sirenia).

After studying the proposed construction plans at each proposed site, the Service concluded that the building and intended use of the docks would result in the "incidental taking"[2] of the Florida manatee.  Additionally, the Service reasoned that the construction of the docks and the operation of motorboats to and from these structures would have more than a "negligible impact" on the Florida manatee species, due to the absence of necessary precautions such as speed zones, sign postings, and enforcement that would protect the manatees in the area from being harmed.  The Service concluded, therefore, that Plaintiffs' permit applications should be denied.  <u>See</u> 16 U.S.C. § 1371(a)(5)(A) (authorizing the issuance of permits to U.S. citizens permitting recreational activities that would cause the incidental taking of protected marine mammals only if the Service finds, *inter alia*, that the "total of such taking . . . will have a negligible impact on such species").

---

of any endangered species or threatened species," 16 U.S.C. § 1536(a)(2), and require federal agencies to consult with the Fish and Wildlife Service whenever a federal action "may affect" such species. 50 C.F.R. § 402.14(a).  The parties do not dispute the propriety of the consultation process that occurred between the Corps and the Service in this case.

[2]  The Act does not define "incidental taking," but the statute provides that the term "take" means "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal."  16 U.S.C. § 1362(13).

Plaintiffs filed this action pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 706, after being notified that their permit applications were denied.  This statute authorizes federal courts to review a federal agency's interpretation of a federal statute.  Plaintiffs do not challenge the Service's findings that the issuance of the permits ultimately would have more than a negligible impact on the Florida manatees inhabiting the creeks, rivers and other internal waters where the docks would be built.  Plaintiffs' sole contention, rather, is that the Act does not apply to residential docks built on Florida's inland waters, and, therefore, the Service unlawfully applied the Act's provisions to deny their permit applications.  Because the dispute is exclusively one of statutory construction, the parties agree that the case should be resolved based on their respective motions for summary judgement.

## II.  Marine Mammal Protection Act

The Act was passed by Congress to protect marine mammal species and population stocks that are or may be "in danger of extinction or depletion as a result of man's activities." 16 U.S.C. §1361(1).  Section 1361 enumerates the congressional findings on which Congress relied in passing the Act, and announces the policies intended to be served by its enactment. The aim of Congress was to prevent marine mammals from "diminish[ing] beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part, and . . . below their optimum sustainable population."  16 U.S.C. § 1361(2).  In furtherance of this purpose, Congress declared that "efforts should be made to protect essential habitats, including the rookeries, mating grounds, and areas of similar significance for each species. . . from the adverse effect of man's actions." Id.  Having found that "marine

mammals [are] resources of great international significance, esthetic and recreational as well as economic," Congress also declared that "they should be protected and encouraged to develop to the greatest extent feasible commensurate with sound policies of resource management . . . [and] it should be the goal to obtain an optimum sustainable population keeping in mind the carrying capacity of the habitat." 16 U.S.C. § 1361(6).

Congress used several methods to further these objectives. First, Congress declared in Section 1371 that "[t]here shall be a moratorium on the taking and importation of marine mammals and marine mammal products, commencing on the effective date of this chapter, during which time no permit may be issued for the taking of any marine mammal . . . ." By "moratorium," Congress meant "a complete cessation" of the taking of marine mammals. 16 U.S.C. §1362(8).

Section 1371 contains a number of exceptions to and exemptions from this general moratorium, allowing the issuance of permits under certain limited circumstances for scientific research; for the taking of marine mammals "incidentally in the course of commercial fishing operations;" for takings that are "in accord with sound principles of resource protection and conservation as provided in the purposes and policies" set forth in Section 1361; and under circumstances where the "incidental, but not intentional, taking by citizens. . .of small numbers of marine mammals. . . will have a negligible impact on such species or stock. . . ." 16 U.S.C. §§1371(a)(1), (a)(2), (a)(3)(A) and (a)(5)(A).

Exemptions from the moratorium are given to Alaskan natives, persons acting in self defense and in defense of property, "Good Samaritans," and for citizens employed on foreign

fishing vessels operating outside the "United States exclusive economic zone."  16 U.S.C. §§ 1371(a)(4)(A), (b), (c), (d) and (e).   Apart from these enumerated exceptions and exemptions, Section 1371 does not contain any limitations on the scope of the moratorium, geographic or otherwise.

In addition to the moratorium set forth in Section 1371, Congress enacted Section 1372 which makes it "unlawful" for persons to take any marine mammal. Section 1372 generally prohibits the taking, possession, transportation, sale, exportation or importation of any marine mammal or marine mammal product.  See generally 16 U.S.C. § 1372.  Unlike Section 1371, the provisions in Section 1372 address the geographic scope of the prohibitions.  For example, Section 1372(a)(1) makes it unlawful for "any person . . . vessel or other conveyance subject to the jurisdiction of the United States to take any marine mammal on the high seas."  The provisions of Section1372(a)(2)(A) make it unlawful for "any person or vessel or other conveyance to take any marine mammal in waters or on lands under the jurisdiction of the United States."  Section 1372(a)(2)(B) prohibit persons from "us[ing] any port, harbor, or other place under the jurisdiction of the United States to take or import marine mammals or marine mammal products."[3]

Congress also included in the Act a grant of exclusive jurisdiction over the conservation and management of marine mammals to the federal government.  16 U.S.C. §

---

[3]  Other provisions in this section not relevant to this action address the possession, transportation, sale, and exportation of marine mammals.  See e.g., 16 U.S.C. § 1372(a)(4).

1379. Under Section 1379(a), Congress usurped state authority over the regulation of marine mammals by prohibiting the States from enforcing or attempting to enforce "any State law or regulation relating to the taking of any species . . . of marine mammal within the State." Section 1379(b) allows for the conditional transfer of the federal government's authority to a State that has developed its own program "consistent with the purposes, policies and goals" of the Act. 16 U.S.C. § 1379(b)(1)(A). These transfers can occur if the State's management and conservation program "does not permit the taking of the species unless and until the State has determined . . . that the species is at its optimum sustainable population" and the State's program does not permit the number of animals of the species to be reduced below their optimum sustainable population. 16 U.S.C. § 1379(b)(1)(c) and (D).

### III.  Analysis

The only issue for consideration is whether the Service properly determined that Plaintiffs' permit applications should be denied. As noted in part I above, the dispute in this case involves the meaning of the Act's provisions. Plaintiffs believe the environmental protections of the Act do not apply to recreational activities on Florida's inland waters, and, therefore, argue that the Service lacked the administrative authority to deny their permit applications. Defendants contend, conversely, that they are entitled to summary judgment because the Act applies to the circumstances of this case.

### A.  Judicial Review of Agency Action

The first issue for a court that is reviewing an agency's construction of a statute under its administration is "whether Congress has directly spoken to the precise question at issue."

Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842 (1984).  This analysis involves reference to "the particular statutory language at issue, as well as the language and design of the statute as a whole." Legal Envtl. Assistance Found., Inc. v. EPA, 276 F.3d 1253, 1258 (11th Cir. 2001) (citing K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988)).  In construing a statute, courts assume that the ordinary meaning of the statute's language accurately reflects its legislative purpose. FMC Corp. v. Holliday, 498 U.S. 52, 57 (1990) (*citations and quotations omitted*).  Additionally, "it is an elementary principle of statutory construction that, in construing a statute, we must give meaning to all the words in the statute." Bailey v. United States, 516 U.S. 137, 146 (1995).

If the intent of Congress is clear, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-843.  If Congress has not directly addressed the precise question at issue through unambiguous terms, the court must decide "whether the agency's answer is based on a permissible construction of the statute." Id. at 843.  An agency's "reasonable" interpretation of a statute must be upheld, notwithstanding any alternative construction that "the court would have reached if the question initially had arisen in a judicial proceeding." FEC v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 39 (1981); Legal Envtl. Assistance Found., 276 F.3d at l258; see also Chevron, 467 U.S. at 844 ("a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency").  Courts are the "final authority on issues of statutory construction," however, and need not grant deference to an agency's interpretation that is

"contrary to clear congressional intent."  Chevron, 476 U.S. at 843 n.11.

## B.  Precise Question at Issue

The parties allocate a considerable amount of their respective briefs on the provisions of Section 1372, arguing that the prohibitions contained therein do or do not extend to the circumstances of this case.  Plaintiffs' argument rests entirely on the provisions of this section.  According to Plaintiffs, the "jurisdiction of the Act is geographically limited" to the high seas, lands under the jurisdiction of the United States, and waters "located seaward of the territorial sea baseline," unless the taking activities occur at "maritime commercial centers" located on a state's inland waters.

This argument is based on Plaintiffs' interpretation of the prohibition provisions in Sections 1372(a)(1), 1372(a)(2)(A), and 1372(a)(2)(B).[4]  As for the provisions in Section

---

[4]  Plaintiffs rely on Section 1372(a)(1), Section1372(a)(2)(A), and Section 1362(15) to support their argument that the Act's protections generally do not apply to the inland waters of a state.   Section 1372(a)(1) makes it unlawful for a taking to occur on the "high seas." Section1372(a)(2)(A) prohibits takings "in waters or on lands under the jurisdiction of the United States," and Section 1362(15) defines "waters under the jurisdiction of the United States" as "the territorial sea of the United States, the waters included within a zone, contiguous to the territorial sea of the United States . . ." and waters located between the national boundaries of the United States and Russia.

Plaintiffs' argument that takings on a state's inland waters are only covered if they are caused by "maritime commercial center" activity is based their interpretation of Section 1372(a)(2)(B). Section 1372(a)(2)(B) prohibits persons from "us[ing] any port, harbor, or other place under the jurisdiction of the United States to take or import marine mammals or marine mammal products." According to Plaintiffs,  the use of the phrase "port, harbor, or other place" limits the section to "maritime commercial centers." Plaintiffs rely on the definitions of "harbor" under a federal statute authorizing interstate agencies and port authorities to undertake studies of proposed harbor projects, see 33 U.S.C. §§ 2231-2241,"port" under a Second Circuit case decided in 1930 involving the terms of a commercial charter contract, see The Baldhill, United States v. Atlantic Refining Co., 42 F.2d 123 (2d Cir. 1930) and the canon of construction *ejusdem generis* (meaning "of the same kind or class") to support this argument.

1371 that establish the moratorium and the ban on taking permits, Plaintiffs contend that the provisions in Section 1372 "refine the scope of the general moratorium."  In other words, Plaintiffs argue that Section 1371 is similarly limited to takings that occur in coastal waters or as a result of "maritime commercial center" activities.

Notwithstanding the extensive briefing that both parties allocated in their Motions  to Section 1372, this section does not regulate the decision-making authority of the Service and it does not control whether the Service should have authorized the issuance of Plaintiff's permits.  Section 1372 regulates the conduct of individuals by making certain acts of taking "unlawful." 16 U.S.C. § 1372(a).  The authority of the Service to allow activities that will result in the taking of marine mammals is governed by Section 1371.

Under the statutory scheme, the Service had to consider whether the exception in Section 1371(a)(5)(A) applied to Plaintiffs' proposed activities, not whether the Plaintiffs' activities constituted a violation of Section 1372.  See 16 U.S.C. § 1536(b)(4)(c) (authorizing a federal action if "an endangered species or threatened species of a marine mammal is involved, [but] the taking is authorized pursuant to section 1371(a)(5) of this title).

As mentioned above, Section 1371 prohibits the issuance of permits that allow for the taking of marine mammals during the time of the moratorium, unless the permit may be issued pursuant to one of the exceptions in the section.  The exception in Section 1371(a)(5)(A) grants the Service the authority to allow "citizens of the United States who engage in a specified activity (other than commercial fishing) within a specified geographical region" to engage in that activity if the "incidental" taking of marine mammals caused

thereby only has a "negligible impact" on the marine mammal species.   16 U.S.C. § 1371(a)(5)(A).

Plaintiffs do not contend that the exception for takings in Section 1371(a)(5)(A) applies to them.  Plaintiffs simply argue that the Act does not apply to takings that occur in a state's inland waters when such takings are caused by recreational activities.  The "precise question at issue," therefore, is whether Section 1371 applies to a state's inland waters without limitations for hazards attributable to recreational activities.  Based on the terms of Section 1371, and the language and design of the Act as a whole, this Court finds that Congress did address this precise question and answered it in the affirmative.

## C.  Congressional Intent

Congress did not explicitly state that the terms of Section 1371 apply to a state's inland waters.  The findings and policy provisions in Section 1361, however, demonstrate a clear congressional intent to protect marine mammals from all man-made threats in all the areas that make up their habitat.  Equally clear is the intent of Congress to use Section 1371 to carry out the objectives in Section 1361 without any limitation based on geography or the nature of the man-made threat.

In Section 1361, Congress recognized that "man's activities" are endangering the existence of marine mammals and declared the "major objective" of the Act to be the prevention of marine mammal species and population stocks from "diminish[ing] beyond the point in which they cease to be a significant functioning element *in the ecosystem of which they are a part*."  16 U.S.C. § 1361(2) (*emphasis added*).  In accordance with this major

objective, Congress stated that the "optimum sustainable population" of each species and population stock should be maintained, meaning that the Act was designed to promote the "number of animals which will result in the maximum productivity of the population stock or the species, keeping in mind the carrying capacity of the habitat and the health of the ecosystem of which they form a constituent element." <u>See</u> 16 U.S.C. § 1361(2); 16 U.S.C. § 1362(9) (defining "optimum sustainable population").  Additionally, Congress noted that marine mammals are "resources of great international significance" and "should be protected and encouraged to develop to the greatest extent feasible commensurate with sound policies of resource management and that the primary objective of their management should be to maintain the health and stability of the marine ecosystem."

These provisions demonstrate in unambiguous terms that the purpose of the Act is to stop the artificial depletion of marine mammals by man's activities so that the optimum number of animals for each  marine mammal population stock and species can be achieved. Not only is there is no indication from Congress that it sought to distinguish between the different areas that make up a marine mammal's habitat or the nature of the man-made threat as part of this principal objective, such distinctions would be inapposite to the achievement of the objective.  Considering marine mammal habitats in their entirety and eliminating all artificial dangers contained therein was clearly a part of Congress' objective, because natural habitats free from all unnatural hazards are what determine the marine mammals' "optimum sustainable population."

This conclusion that the Act was designed to protect marine mammals from all man-made threats in all the areas inhabited by them, including a state's internal waters, is not only consistent with the terms of Section 1361 and logically sound, it is supported by the provisions in Section 1379 granting the federal government exclusive jurisdiction over the conservation and management of marine mammals.  Because Congress prohibited the States from enforcing or attempting to enforce any State laws or regulations relating to the taking of any marine mammal "within the State," Congress clearly expected the protections of the Act to apply to all areas within the states, including internal waters.  See 13 U.S.C. § 1379(a). Plaintiffs' suggestion that the Act does not apply to these areas actually weakens the legal protections offered to marine mammals by nullifying applicable state laws and not replacing them with any federal law.  This interpretation produces a rather absurd result for a federal law clearly designed to optimize the number of marine mammals that exist in each population stock or species.

The Act's legislative history also conflicts with Plaintiff's interpretation of the statute. Congress declared that "[t]he purpose of this legislation is to prohibit the harassing, catching and killing of marine mammals by U.S. citizens *or within the jurisdiction of the United States . . ." (emphasis added)*.  With respect to Florida manatees in particular, the legislative history demonstrates that Congress understood the operation of recreational motorboats to be one of the principal causes of the artificially low numbers of manatees, and it designed the Act to protect manatees from this hazard in the areas that make up their habitats.  See 1972 H.R. Rep. No. 92-707 (1972), reprinted in 1972 U.S.C.C.A.N. 4144, 4147-4150 (noting that

"manatees . . . have been . . . run down by boats . . . and exposed to a multitude of other indignities, all in the interests of profit and recreation;" acknowledging "the operation of powerboats in areas where the manatees are found" as one of the principal hazards to which manatees are exposed; and announcing that "at present the Federal government is essentially powerless to force these boats to slow down or curtail their operations").

Faced with these statements in the legislative history, Plaintiffs contend that the failure to include the word "all" in the phrase "in areas where manatees are found" indicates Congress sought to protect manatees only in some areas that make up the manatee habitat. This omission is insufficient to cast doubt on Congress' intent to protect marine mammals throughout their habitats. First, there is no evidence in the legislative history to support Plaintiffs' interpretation that the phrase "in areas where manatees are found" means "only some areas where manatees are found." Second, the legislative history demonstrates that Congress was aware that many marine mammals lived part of their lives outside of the sea. Id. at 4148 ("the bill covers all mammals who spend part or all of their lives in the sea"). With this understanding, it would seem likely that Congress would announce an intention not to protect a marine mammal in a particular area if this was its intention. Third, Plaintiffs' interpretation is inconsistent with the design of the statute as a whole, including the stated objective of the Act to achieve the optimum sustainable population for each marine mammal population stock or species and the federal preemption of state law "within" each state. Finally, there is simply no evidence in the legislative history to support Plaintiffs' theory that the application of the Act to a state's inland waters is conditioned on maritime commercial

center activity.

Having determined that the clear objective of the Act is to protect marine mammals from man-made dangers in all areas that make up their natural habitat, the Court now turns to the provisions of Section 1371.  The terms of this Section clearly demonstrate that it was designed to fulfill the principal objective Congress enumerated in Section 1361, without the limitations suggested by Plaintiffs.

The moratorium on takings and permits in Section 1371 undoubtedly was designed to further the objectives set forth in Section 1361, for both of these measures address the ultimate cause Congress identified in that section as the threat to achieving an optimum sustainable population for marine mammals: "man's activities."  Additionally, Congress used rather absolute terms to articulate this chosen method of protecting marine mammals, to wit: a "complete cessation" on the taking of marine mammals, during which time "no" permit can be issued that authorizes such activity.  By modifying the term "cessation," which by itself is normally understood to mean "the act or fact of putting an end to something," see Websters II: New College Dictionary 975 (Houghton Mifflin Co. 1999) (defining "cessation" and "cease"), with the term "complete,"  Congress clearly designed Section 1371 to end the taking of marine mammals without regard to the nature of the activity that caused the taking or the precise location within the habitat where the taking occurred.  Cf. Duncan v. Walker, 533 U.S. 167, 174 (2001) (holding that "every clause and word of a statute" must be given effect).

The exceptions to the moratorium in Section 1371 also demonstrate that the section is intended to operate to further the Act's objectives.  These exceptions are either directly conditioned upon conformity with the Act's objectives, or, as with the exception at issue in this case, are limited by their very terms to avoid any conflict with these objectives.  For example, the exception in Section 1371(a)(1) allows for the issuance of permits for takings caused by scientific research, public display, photography for education or commercial purposes, or enhancing the survival or recovery of a species or stock . . . [so long as the proposed taking] is *consistent with the purposes and policies of section 1361 of this title*" *(emphasis added)*.  See also 16 U.S.C. 1371(a)(2) (providing similar terms); 16 U.S.C. 1371(a)(3)(A) (authorizing the Secretary to waive the moratorium, provided the taking "is in accord with sound principles of resource protection and conservation *as provided in the purposes and policies of this chapter*") *(emphasis added)*.  Section 1371(a)(5)(A), the exception applicable to this case, allows for the "incidental" takings of marine mammals "by citizens of the United States who engage in a specified activity other than commercial fishing" only if such takings have a "negligible impact on a species or stock" and if regulations are promulgated to allow for "the least practicable adverse impact on such species or stock and its habitat."  See 16 U.S.C. § 1371(a)(5)(A); see also 1371(a)(5)(D)(I) (conditioning certain takings on identical terms).

The conditions and limitations incorporated into the exceptions to the moratorium ensure that the Act's overall objective of reaching an optimum sustainable population for each marine mammal population stock or species will not be compromised by activities that

the government authorizes through the permit process. Additionally, the fact that the exception at issue in this case is directed at citizens engaging in activities "other than commercial fishing" undermines Plaintiffs' argument that Section 1371 only applies to takings on inland waters if the takings are caused my maritime commercial center activities.

The legislative history also indicates that Section 1371 in particular operates to further the Act's objectives without limitations, and accordingly applies to all man-made threats and all the areas that make up the marine mammals' habitats. Congress explained that the purpose of the Act was to prevent takings of marine mammals, "unless taken under the authority of a permit issued by an agency of the Executive Branch." 1972 H.R. Rep. No. 92-707 (1972), reprinted in 1972 U.S.C.C.A.N. 4144. It also declared with respect to manatees in particular that passage of the Act "would provide the Secretary of the Interior with adequate authority to regulate or even forbid the use of powerboats *in waters where manatees are found* . . ." (*emphasis added*). Id. at 4150. Because Section 1371 governs the Service's authority to issue or deny taking permits, these declarations along with Congress' recognition of the hazards posed by the recreational use of motorboats demonstrate that Congress expected Section 1371 to apply to activities of any nature and in the areas that constitute a marine mammal's habitat.

Plaintiffs' argument that the provision in Section 1372 should be engrafted onto Section 1371 is belied by the unambiguous design of the statute as a whole and Section 1371 in particular. As an initial matter, this Court is not convinced that the terms of Section 1372 are as limited as Plaintiffs contend because these provisions also must be construed in the

context of the statute as a whole.  The legislative history appears to contradict Plaintiff's

interpretation of Section 1372 because it indicates that Congress expected the prohibitions

to create a moratorium for at least two years that would prohibit any taking of a marine

mammal without a permit.  Id. at 4153; see United States v. Mitchell, 553 F.2d 996, 1000

(1977) ("[t]he Committed reasoned that a de facto moratorium would develop from the

prohibitions because any taking without a permit would be deemed unlawful).  Even

assuming Plaintiffs' reading of Section 1371 is correct, nothing in Section 1371, Section

1372 or the legislative history supports Plaintiffs' argument.

Admittedly, the exact relationship between the moratorium on takings and ban on

permits in Section 1371 and the prohibitions on takings in Section 1372 is not clear.  This

ambiguity was recognized by the Fifth Circuit in Mitchell, 553 F.2d at 1000-1001 (noting

that the legislative history "does not explain the need for both the moratorium and the

prohibitions).  Plaintiffs rely on Mitchell to support their argument that the purported

geographic and "maritime commercial center" limitations in Section 1372 modify the

provisions in Section 1371.  This reliance is misplaced.

In Mitchell, an American citizen was being prosecuted for taking dolphins within the

territorial waters of the Bahamas pursuant to a Bahamian work permit he had been issued.

Id. at 997.  The defendant was found guilty in the district court for violating regulations

promulgated under Section 1371 which made it unlawful for "any person subject to the

jurisdiction of the United States to take any marine mammal during the moratorium."  Id. at

999, n.1.  The defendant was acquitted, however, of the charge that he violated the

prohibition on taking in Section 1372(a)(1), presumably on the grounds that his activities were not conducted on the high seas as required by the Act. Id.

The issue on appeal was whether the Service's extension of the moratorium in the regulations to the territorial waters of another sovereign country was beyond the scope of the Act. Relying primarily on the authority sovereign states have over their own natural resources, the legislative history of the Act which indicated that marine conservation in other countries was to be left to diplomatic negotiations and the long-standing presumption against extraterritorial extension of American statutes in the absence of "a clear expression of congressional intent," the Fifth Circuit found the regulations to be an invalid extension of the Act and reversed the defendant's conviction. Id. at 1002-1005.

Plaintiffs maintain that the Fifth Circuit confirmed in Mitchell that "the Act's legislative history does demonstrate the moratorium and the prohibition on take are interrelated and the moratorium was intended to limit the issuance of incidental take permits and not to expand the geographic scope of the Act. See Plaintiffs' memorandum in support (Dkt. #68), p. 17-18. This argument misrepresents the holding in Mitchell. The Fifth Circuit's actual finding in Mitchell was that "it is not clear . . . from the legislative history as a whole whether the moratorium was intended to have broader territorial effect than the prohibitions . . . ." Id. at 1001. More importantly, this finding was limited to the purported extension of the moratorium to the "territory of other sovereigns," not to areas within the jurisdiction of the United States. Id. The Fifth Circuit did note in dicta that Section 1371 and 1372 were "interrelated," but its decision did not address the application of these

provisions to the areas within the United States.  Id.  Mitchell, therefore, does not advance Plaintiffs' cause.

Moreover, even if Plaintiffs' reading of Mitchell was correct, and the provisions of Section 1371 could not be considered to have expanded the geographic scope of the Act, at least one of the prohibitions in Section 1372 apply wherever the United States has jurisdiction.  See 16 U.S.C. § 1372(a)(2)(B) (prohibiting the use of "any port, harbor, or other place under the jurisdiction of the United States to take or import marine mammals or marine mammal products").  Accordingly, applying the moratorium provisions of Section 1371 to a state's inland waters would not constitute an expansion of the geographic scope of the Act.

## IV.  Conclusion

The terms and design of the Act, along with the legislative history, demonstrate clearly that Congress identified man's activities as the undesirable cause of marine mammals' artificially low numbers, and recognized these activities as being both commercial and recreational in nature.  Congress' objective was unmistakable: to protect marine mammals from these artificial hazards so that their numbers can reach and maintain equilibrium with their natural habitats.  The "complete cessation" on takings and the provisions governing the issuance of permits established in Section 1371 was clearly designed to further this objective. To hold that Section 1371 does not extend to certain areas inhabited by marine mammals would divorce this section from the Act's objective by permitting "man's activities" of a recreational nature to continue unabated in areas making up marine mammal habitats. Because the Service's construction and application of the Act is in accord with the

unambiguously expressed intent of Congress, the decision to deny Plaintiffs' permits must be upheld.

It is therefore ORDERED and ADJUDGED that:

1.     Defendants' Motion for Judgment on the Pleadings (Dkt. #57) is **GRANTED**.

2.     Plaintiffs' Second Motion for Summary Judgment (Dkt. #67) is **DENIED**.

3.     The Clerk of Court is directed to enter a final judgment against Plaintiffs and in favor of Defendants, **TERMINATE** all pending motions as moot, and **CLOSE** the case.

**DONE** and **ORDERED** in Tampa, Florida on July 13, 2005.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record

S:\Odd\2003\03-cv-229 Summ Judg Order.wpd